**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
MARC DURON,

                    Plaintiff,

      -against –

MOMENTUM-NA, INC. doing business as MOMENTUM WORLDWIDE,
THE INTERPUBLIC GROUP OF COMPANIES, INC.,
MCCANN WORLDGROUP, LLC,
5 O'CLOCK, LLC,
MAY BARAKAT, and
KEVIN MCNULTY,

                    Defendants.
------------------------------------------------------------------------x

Docket No: 1:22-cv-1824

**COMPLAINT**

*Jury Trial Demanded*

Plaintiff Marc Duron by his attorneys Goddard Law PLLC alleges upon knowledge with respect to himself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This is a civil action brought on behalf of Plaintiff Marc Duron against Momentum Worldwide and the various legal entities which employed him, for discrimination on the basis of gender and sexual orientation, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq*. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law 290, *et seq*. ("NYSHRL"), and the New York City Human Rights Law, N.Y. Admin Code 8-101, *et seq*. ("NYCHRL") together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

2. The Court has both federal subject-matter jurisdiction and diversity jurisdiction over Plaintiff's Title VII claims.

1

3. The Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims pursuant to 42 U.S.C. § 1367(a) because they form part of the same case and controversy with Plaintiff's federal claims.

4. Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred here.

## ADMINISTRATIVE PREREQUISITE

5. On or about July 20, 2020, Plaintiff filed a Charge of Discrimination with the New York District office of the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging claims of sex discrimination and retaliation. On or about December 6, 2021, Plaintiff received a right to sue from the EEOC.

## THE PARTIES

6. Plaintiff Marc Duron (hereinafter "Plaintiff") is a homosexual man who is citizen of the United States. Plaintiff resides in Los Angeles, California and is an Executive Creative Director and Senior Vice President. Plaintiff was subjected to a hostile work environment due to gender and sex that resulted, ultimately, in Defendants' termination of his employment.

7. Plaintiff was, at all times relevant herein, Defendants' "employee" within the meaning of all relevant Federal, State and local laws.

8. Momentum Worldwide is a trade name or company of unknown corporate organization with its headquarters located at 300 Vesey Street, 15th Floor, New York, New York 10282. It answered Plaintiff's Charge of Discrimination in the underlying proceeding underlying this action at the U.S. Equal Employment Opportunity Commission without identifying its true legal identity or the identity of Plaintiff's employers. Plaintiff will ask the Court to order the Defendants to make the necessary identifications in this action.

9. Defendant Momentum-NA, Inc. is a corporation organized under the laws of Colorado, registered to do business in New York, with its principal place of business located at 300 Vesey Street, New York, New York. Upon information and belief, it is one of the legal entities doing business as Momentum Worldwide.

10. Defendant The Interpublic Group of Companies, Inc. (hereinafter "IPG") is a corporation organized under the laws of Delaware, registered to do business in New York, with its principal place of business located at 909 Third Avenue, New York, New York. It held itself out as Plaintiff's employer, and upon information and belief is a holding company, parent company, or otherwise liable as Plaintiff's employer as a joint employer with Momentum Worldwide.

11. Defendant McCann Worldgroup, LLC is a company organized under the laws of Delaware, registered to do business in New York. It held itself out as Plaintiff's employer, and upon information and belief is a holding company, parent company, or otherwise liable as Plaintiff's employer as a joint employer with Momentum Worldwide.

12. Defendant 5 O'Clock LLC is a company organized under the laws of Delaware, registered to do business in New York. It held itself out as Plaintiff's employer, and upon information and belief is a subsidiary, alter ego, or otherwise liable as Plaintiff's employer as a joint employer with Momentum Worldwide.

13. Collectively, the corporate Defendants are referred to herein as "Defendants" or as "Momentum."

14. Defendant May Barakat (hereinafter "SVP Barakat") was Momentum's Senior Vice President of Client Operations and Plaintiff's supervisor. Momentum is liable for SVP Barakat's actions under federal, state, and City law, and SVP Barakat is also individually liable for her actions under state and City law.

15. Defendant Kevin McNulty (hereinafter "President McNulty") was Momentum's President. Momentum is liable for President McNulty's actions under federal, state, and City law, and President McNulty is also individually liable for his actions under state and City law.

## FACTUAL BACKGROUND

### Plaintiff's Marketing Agency Joins Defendants' Agency

16. Plaintiff was the Senior Vice President of a lucrative marketing agency called VOWEL, LLC ("VOWEL"), which was a subsidiary of PMK-BNC, a full-service marketing firm, which was a subsidiary of some or all of the Defendants named in the instant Complaint.

17. In the summer of 2019, IPG made the decision to merge PMK-BNC with a competitor. IPG gave Plaintiff the authority to decide where his team would go. Defendants offered Plaintiff to have his team join Defendants, and PMK-BNC offered Plaintiff to have his team stay on with them.

18. Plaintiff informed Defendants that he was hesitant to join them because he did not feel like his strength was operations. Defendants guaranteed that they would provide him with operations support, specifically that they would assign a Senior Vice President who would scale and grow VOWEL's business.

19. Because of this guaranteed operations support and opportunity to grow, Plaintiff made the decision to have his team join Defendants.

20. Defendants assigned SVP Barakat to oversee operations for Plaintiff's team.

21. In around September of 2019, Plaintiff traveled to New York, where SVP Barakat worked, to meet with her and Defendants' executive team. Plaintiff and SVP Barakat's first meeting was filled with excitement. SVP Barakat told Plaintiff that she was thrilled that

4

Defendants acquired Plaintiff's team because she believed their area of expertise, Digital Influencer Marketing, was a "bright revenue driving future of [Defendants'] business."

22.     SVP Barakat also spoke about how excited she was to work with Plaintiff because members of Defendants' executive team – including Defendants' CEO, President, and Executive Vice President – had told her that Plaintiff was a hard worker who was excellent to work with.

23.     Plaintiff was thrilled that SVP Barakat had such a great attitude about the arrangement and he was confident that he had made the right choice in bringing his team to Defendants.

24.     Over the next two months, SVP Barakat and Plaintiff worked seamlessly together to bring Plaintiff's team to Defendants.  SVP Barakat was cc'ed on every e-mail regarding the transition of Charting Party's team to Defendants.  She introduced Plaintiff to all Defendants' employees he would need to work with. During this time, SVP Barakat continued to express how thrilled she was with their working relationship, Plaintiff's team, and the expertise in Digital Influencer Marketing that Plaintiff brought to Defendants.

### SVP Barakat Finds Out Plaintiff is Homosexual and Becomes Immediately Hostile

25.     Sadly, at the end of October 2019, Plaintiff's ten-year relationship with his partner had come to an end.  Plaintiff took two personal days off from work on October 31st and November 1st 2019 because his partner was moving out of their shared home.

26.     Plaintiff asked SVP Barakat to provide departmental leadership and staff coverage for him at work during those two days because his partner Dan and he were ending their relationship and "he was moving out of their shared home."

27.     Shockingly, SVP Barakat sounded noticeably surprised and made a strange and inappropriate homophobic comment, that "relationships are hard and that's why when it's between

two men it will never work." Plaintiff was taken aback and realized that she must not have previously known that he was gay.

28. It was clear to Plaintiff that SVP Barakat was expressing her disapproval about homosexual relationships. Though troubled, alarmed and offended by the comment, Plaintiff hoped she had had a slip of the tongue and that the comment was not reflective of SVP Barakat's actual beliefs.

### SVP Barakat, After Finding out Plaintiff's Sexual Orientation, Subjects Him to A Hostile Work Environment and Sets Him Up to Fail

29. When Plaintiff returned to work on November 4th 2019, he was met by blatant hostility from SVP Barakat who was no longer willing to work with him or his team.

30. SVP Barakat sent several e-mails to Plaintiff in which she told him to no longer cc her on work related e-mails. She provided bizarre excuses and rationales for not being cc'ed, despite the fact that she was heading operations for Plaintiff's team and their work projects had to either be approved by her or needed her input.

31. For instance, around December 12, 2019, Plaintiff and SVP Barakat were working on IT issues transitioning Plaintiff's team to Momentum. SVP Barakat was on the e-mails with IT along with many other senior officers from Momentum. She emailed Plaintiff stating she was reminding him to "remove [her] from these types of e-mails." Like, previous e-mails, SVP Barakat gave a bizarre excuse-- that she had "left the office for the year and [her] computer is now with IT."

32. SVP Barakat also stopped attending important phone conferences for Plaintiff's team and failed to respond to many emails she was cc'ed on.

33. On January 1 2020, Plaintiff's team formally became part of Momentum. Instead of celebrating their achievement, SVP Barakat bitterly warned Plaintiff that he had "90 days to

6

prove himself" or Momentum would end the relationship. Plaintiff was taken aback because he had never been told that there would be a probationary period of any kind.

34. Thereafter, despite the formal acquisition, SVP Barakat went out of her way to block the full integration of Plaintiff and his team into Defendants' company. Upon information and belief, she did so in order to convince Defendants to end the relationship.

### SVP Barakat Sabotages Plaintiff's Business Opportunities

35. One of Plaintiff's team members was contacted about potential new business for the team with Bow Tie Cinemas. Plaintiff's team began working on a pitch for Bow Tie Cinemas. On the last day the pitch was due, Plaintiff followed up three times with Momentum's employees, including SVP Barakat, who failed to respond. Finally, SVP Barakat told him that there was "no need to do anything here" because she was working with Momentum's other employees to submit the pitch under Defendant's name not Plaintiff's team name.

36. Upon information and belief, SVP Barakat stole this opportunity from Plaintiff and reassigned it to another part of Defendants to justify ending Plaintiff's employment and purposely leaving him and his team out.

37. Thereafter, SVP Barakat openly and egregiously interfered with Plaintiff's busines leads including William Grant & Sons Hot Air Balloon 2020 Experience; Hendrick's Gin; VZFM, a Verizon digital music festival; Accor Hotel Group 'Limitless Weekend' Influencer Experience; The CW Network Coronavirus Response Campaign; Chobani digital influencer planning; Powerade digital influencer planning; Angels Envy new business Pitch; GAP new business pitch; and SmartWater Influencer Planning.

38. SVP Barakat not only took business opportunities away from Plaintiff and his team, but also made it increasingly difficult for Plaintiff and his team to maintain current clients.

39. For example, Plaintiff's client Theragun wanted pricing for a potential project. Plaintiff and his team worked tirelessly to get the strategy and budget done; however, they needed to get sign off from Defendants' employees, who were delaying. Plaintiff received an e-mail from Theragun requesting they be sent pricing ASAP or else they could not move forward. When Plaintiff communicated this to SVP Barakat, she nonsensically reported that she "didn't see a problem." Plaintiff reminded SVP Barakat that the his team members did not fully understand Defendants' fees or budget requirements so without Defendants' help and input they would make a mistake or lose the client. SVP Barakat did nothing to solve the problem with the Defendants' team delays.

40. Plaintiff was concerned because of the 90-day ultimatum SVP Barakat had placed on him and his team. Upon information and belief, SVP Barakat did not want to work with Plaintiff because of his sexual orientation and was blatantly setting him up to fail.

### Plaintiff Seeks Help From Human Resources

41. SVP Barakat's obstinance became such a problem that in February 2020, Plaintiff realized that he had to seek assistance from HR.

42. Although Plaintiff knew that SVP Barakat's entire attitude towards him changed the moment she found out he was gay, and even though he knew that was illegal and unfair, he feared retaliation and decided that he had a better chance of success at Momentum if he just tried to get away from SVP Barakat.

43. He asked Human Resources ("HR") if Defendants would remove SVP Barakat from his team's daily work streams because she was unable to provide the clearance that he needed to perform his work.

44. HR agreed and removed SVP Barakat from all of Plaintiff's workstreams.

8

### **SVP Barakat Tries to Steal Plaintiff's Team Members**

45.     In March 2020, the Covid-19 pandemic hit, creating economic losses for the agency at-large, and because of the new amount of work during the pandemic, Plaintiff and his team had to work with SVP Barakat on several projects again.

46.     Plaintiff heard from two members of his team that SVP Barakat reached out to them and told them that she believed Plaintiff's team would fail and offered to move them to a different team to protect them for Plaintiff's inevitable "failure to integrate and generate revenue." Upon information and belief, SVP Barakat steadfastly continued her personal mission to ensure that Plaintiff's team failed because she did not want to work with a gay man.

### **Despite SVP Barakat's Obstructionist Behavior,**
### **Plaintiff Is Able To Bring in New Business to Momentum**

47.     Despite having to work with SVP Barakat again, Plaintiff worked extremely hard to bring in new business for Momentum.  He immediately began creating pandemic-specific new business pitches, and agency-wide resources to help guide Momentum's clients during the crisis and aimed at generating new business during the pandemic.

48.     Plaintiff and his team signed two new projects, Mondelez Camp Honeymaid and Airbnb Online Experiences, which would bring in around $86,425 of revenue. American Express a current client of Plaintiff's team also signed a deal worth $34,000 in revenue for COVID response.

49.     Also in the middle of March, SVP Barakat asked Plaintiff to provide an update on his team's revenue to Momentum's Chief Financial Officer Philippe Touzot.  Plaintiff provided a list of clients that his team had signed, projects that were about to be signed and other opportunities on the horizon.

50. After providing these revenue updates to SVP Barakat and CFO Touzot, Plaintiff asked HR if there was anything he needed to do since his 90 day trial period was coming to an end. HR merely told him just to continue to work on bringing in revenue and providing marketing materials for Momentum.

51. Around April 17th, 2020, Plaintiff and his team created an "influencer toolkit" to assist Momentum's clients during the pandemic for immediate distribution. President McNulty and other executives were thrilled with the work, including President McNulty, who said "Beautiful [Plaintiff]! We can send out early next week."

52. However, SVP Barakat, who did not respond until May 4th 2020 after multiple follow-up e-mail requests put a hold on the roll-out of the toolkit-thereby making it untimely and irrelevant.

53. Plaintiff never heard back from SVP Barakat or HR how the trial period had went and whether he needed to do more in order to prevent his team from being terminated.

**Plaintiff Reports SVP Barakat's Discriminatory Behavior to HR**

54. Plaintiff reported his concerns with SVP Barakat's seemingly purposeful delays and animosity towards him and his team to VP of Talent Resources Jacqueline Debien in Defendants' Human Resources Department ("HR VP Debien").

55. Specifically, Plaintiff e-mailed HR VP Debien and told her that SVP Barakat had been placed on two workstreams with him again and that it has become very clear to him SVP Barakat was separating his team from the rest of the company. He asked her for advice on whether he should lodge a formal complaint with HR.

56. HR VP Debien e-mailed Plaintiff and told him cryptically that she had "thoughts on this" and that she wasn't "sure if it's the right thing." HR VP Debien later e-mailed Plaintiff

that SVP Barakat was very powerful in the company, specifically that the only thing "more powerful than [SVP Barakat] is money." She also informed him that SVP Barakat was "creating negative associations" with his practice area, Digital Influencer Marketing, with President McNulty and other executives at the company.

57. On April 28, 2020, Plaintiff and HR VP Debien had a phone meeting. During this meeting HR VP Debien told Plaintiff that because of SVP Barakat's urging, Momentum's clients were not invited to view Plaintiff's team's webinars or other valuable resources created by Plaintiff's team.

58. Plaintiff was incredibly angry that SVP Barakat had been working against him this whole time, but was also not surprised due to her homophobic behavior.

59. VP Debien told Plaintiff that she believed that SVP Barakat was biased against him and urged Plaintiff to file a complaint regarding SVP Barakat's discriminatory behavior with Chief Talent Officer Jennifer Frieman ("CTO Frieman").

60. Due to VP Debien's support and agreement that SVP Barakat was discriminating against him, on May 5, 2020, Plaintiff reported sexual orientation discrimination to CTO Frieman on the phone. Plaintiff then sent her a follow up e-mail summarizing his complaint on the phone. In the e-mail Plaintiff stated that "[SVP Barakat] may have a personal dislike towards [him] for being gay based on the phone conversations" they had. "The conversations [Plaintiff] had with her made [him] feel uneasy and gave the impression that she was uncomfortable with same-sex relationships."

61. Plaintiff also included in his e-mail that "following that timeframe, beginning in the week of 11/4/2019, there was a new but consistent lack of communication, delayed

11

communication patterns, missing of calls and meetings, asking to be removed from cc in our team communication and the beginning of negative stereotyping."

62. On May 9, 2020, Human Resources Talent Manager Mary Finch ("HR Manager Finch") contacted Plaintiff to inform him that Defendants would be investigating his claims of sexual orientation discrimination.

63. On May 11, 2020, HR Manager Finch asked Plaintiff for a summary of his sexual orientation discrimination claims. Plaintiff sent the investigator some of the e-mails quoted above, including e-mails where SVP Barakat asked to not be cc'ed, e-mails where she took business away from Plaintiff's team, and e-mails where she made negative comments about Plaintiff's expertise which he felt demonstrated SVP Barakat's discriminatory animus towards him.

64. Throughout this time, Plaintiff and his team continued to bring business into Defendants. By the middle of May, Plaintiff's team had pitches open for a potential $536,263.50 of new business.

### Plaintiff Is Terminated the Day Defendant Concludes Its Investigation and Finds No Discrimination

65. On May 19, 2020, HR Manager Finch called Plaintiff to let him know that Defendants had completed their "investigation" and found that his claims of discrimination were unsubstantiated.

66. Only a few minutes after the call from HR Manager Finch, Plaintiff received a calendar invitation to meet with CTO Frieman and President McNulty to speak at 3 P.M. that day.

67. On the conference call, Defendants informed Plaintiff that he and his entire team was being terminated "due to a lack of revenue caused by COVID-19." Upon information and belief, President McNulty made the ultimate decision to terminate Plaintiff and his team with the

12

knowledge that SVP Barakat had discriminated against him and Plaintiff had complained of the same.

68. Defendants' excuse of course made absolutely no sense at all, because Plaintiff was one of the only employees to bring in a large amount of business during COVID-19 and his team had many profitable opportunities in the pipeline.

69. Defendants told him that although his entire team was being terminated, they would like him to stay on alone until June 30, 2020 to complete the team of twelve people's current projects by himself.

70. Upon information and belief, Plaintiff's team was the only team that was entirely eliminated.

71. Upon information and belief, Plaintiff and his team's termination was in direct retaliation due to his complaint of sexual orientation discrimination.

72. Upon information and belief, when many clients found out about the termination of Plaintiff and his team they pulled their business from Defendants, including American Express, which requested a full refund of $34,000.

73. Throughout Plaintiff's working relationship with SVP Barakat, he saw a psychiatrist for the emotional distress her harassment caused him. Plaintiff had multiple manifestations of stress including stress induced vertigo, anxiety and insomnia resulting from the harassment, discrimination and retaliation. Plaintiff continues to suffer from the effects of SVP Barakat's discrimination to this day.

**AS AND FOR THE FIRST CAUSE OF ACTION**
*Discrimination on the Basis of Gender and Sexual Orientation in Violation of Title VII*
Against the Corporate Defendants

74. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

75. Defendants have discriminated against Plaintiff on the basis of his gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII"). Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

76. Defendants have discriminated against Plaintiff by treating him differently from and less preferably than similarly situated heterosexual employees and by subjecting him to severe and pervasive harassment, a hostile work environment, disparate terms and conditions of employment on the basis of his gender and sexual orientation.

77. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

78. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

**AS AND FOR THE SECOND CAUSE OF ACTION**
*Retaliation in Violation of Title VII*
Against the Corporate Defendants

79. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

80. Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of him.

81. In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, disparate treatment, and termination of Plaintiff's employment.

82. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

83. As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

84. By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

**AS AND FOR THE THIRD CAUSE OF ACTION**
*Discrimination on the Basis of Gender and Sexual Orientation
in Violation of the NYSHRL and NYCHRL*
Against All Defendants

85. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

86. Defendants have discriminated against Plaintiff on the basis of his gender and sexual orientation in violation of the New York State Human Rights Law, New York State Executive Law § 296, et seq., and the New York City Human Rights Law, the Administrative Code of the City of New York § 8-101, et seq. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

87. Defendants have discriminated against Plaintiff by treating him differently from and less preferably than similarly situated heterosexual employees and by subjecting him to harassment, a hostile work environment, discriminatory pay, disparate terms and conditions of employment, and/or other forms of discrimination on the basis of his gender and sexual orientation,

by their own discriminatory acts, by aiding and abetting discrimination, and by endorsing and condoning those acts.

88. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

89. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*Retaliation in Violation of the NYSHRL and NYCHRL*
Against All Defendants

90. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

91. Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of him.

92. In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to harassment, a hostile work environment, disparate treatment, and termination of his employment.

93. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, by their own discriminatory acts, by aiding and abetting discrimination, and by endorsing and condoning those acts.

94. As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

95. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York Human Rights Law.

## DEMAND FOR JURY

96. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, having set forth his Complaint, Plaintiff respectfully requests that he be awarded all available relief under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law, including, but not limited to, a declaratory judgment that the acts and practices of the Defendants complained of herein are in violation of law, injunctive relief, compensatory and punitive damages, prejudgment interest, attorney fees, expenses, and costs, and all other and further relief that the Court deems just and proper.

Dated: New York, New York
       March 3, 2022

GODDARD LAW PLLC
*Attorneys for Plaintiff*

By: /s/ Megan S. Goddard
Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Tel: 646-504-8363
Fax: 212-208-2914
Megan@goddardlawnyc.com
